**Opinion filed March 1, 2012**



# In The

# Eleventh Court of Appeals

_____

## No. 11-10-00073-CR

_____

## MICHAEL JARROD MCGOUGH, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 91st District Court**
**Eastland County, Texas**
**Trial Court Cause No. 21655**

### M E M O R A N D U M   O P I N I O N

The jury convicted Michael Jarrod McGough of continuous sexual abuse of a young child and assessed his punishment at confinement for ninety-nine years. We affirm.

*The Charged Offense*

A person commits the offense of continuous sexual abuse of a young child if:

    (1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse . . . ; and

    (2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age.

TEX. PENAL CODE ANN. § 21.02(b) (West Supp. 2011). An "act of sexual abuse" includes, as relevant here, aggravated sexual assault under Section 22.021 of the Penal Code and indecency with a child under Section 21.11(a)(1) of the Penal Code. *Id.* §§ 21.02(c)(2), (4).

The indictment alleged all the statutory elements of the offense of continuous sexual abuse of a young child. Specifically, the indictment alleged that appellant, "on or about **September 1, 2007 through November 16, 2007,** and during a period that was 30 days or more in duration, committed two or more acts of sexual abuse against **Jane Doe [a pseudonym]**."[1] The indictment further alleged that, at the time the acts of sexual abuse were committed, appellant was seventeen years of age or older and the child was younger than fourteen years of age and not the spouse of appellant. The indictment alleged the acts of sexual abuse to be (1) indecency with a child by contact by touching the anus of the child, (2) indecency with a child by contact by touching the genitals of the child, (3) aggravated sexual assault by causing the penetration of the anus of the child by the sexual organ of appellant, and (4) aggravated sexual assault by causing the penetration of the sexual organ of the child by the sexual organ of appellant.

### Issues on Appeal

Appellant presents two issues for review. Both issues challenge the sufficiency of the evidence to support his conviction. In his first issue, he contends that the evidence was factually insufficient to establish that sexual abuse occurred. In his second issue, he contends that the evidence was legally insufficient to establish that, if sexual abuse in fact occurred, it occurred over a period of thirty or more days as required by Section 21.02(b) of the Penal Code.

### Standard of Review

We review a challenge to the sufficiency of the evidence, regardless of whether it is denominated as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

---

[1]The child's actual name was disclosed and used during trial. However, we will refer to the child as "Jane Doe" in this opinion to protect her identity.

*The Evidence at Trial*

The record shows that Jane Doe is appellant's daughter. Jane Doe's mother is E.M.M.[2] Jane Doe was twelve years old at the beginning of the time period alleged in the indictment (September 1, 2007) and thirteen years old at the end of that time period (November 16, 2007). In 2007, Jane Doe, her parents, and her two younger siblings lived in a house in Cisco, Texas.

Jane Doe and her siblings spent the summer of 2007 with their grandparents in Kansas. They returned to Cisco in the middle of August before the new school year started. Jane Doe testified that appellant sexually assaulted her on multiple occasions after she got back from Kansas. She said that the first such incident occurred in the house a few days after her return to Cisco. Jane Doe believed that this incident occurred in the laundry room. She said that, on this occasion, appellant made her sit on the washing machine. Jane Doe said that appellant touched his penis to her back, made her take off her panties, and then stuck his penis in her vagina. Jane Doe said that she typically referred to the "penis" and the "vagina" as bad spots and that appellant stuck his penis into her bad spot while she was on the washing machine.

Jane Doe testified that appellant engaged in the same conduct in her bedroom. She said that appellant made her take off her pants and underwear and lie down on the bed. According to Jane Doe, appellant then got on top of her and stuck his penis into her vagina. Jane Doe said that appellant engaged in this conduct more than one time in her bedroom and that she believed he engaged in this conduct more than five times in her bedroom. Jane Doe testified that appellant did not wear underwear and that, when he sexually assaulted her, he unzipped his pants and took out his penis. Jane Doe testified that appellant engaged in the same conduct with her on the water bed in his bedroom. She said that, on these occasions, appellant made her lie down on the water bed and that appellant then stuck his penis into her vagina. Jane Doe was "pretty sure" that appellant engaged in this conduct more than five times in his bedroom. Jane Doe said that, on one occasion, appellant made her sit in a salon chair that was in the master bathroom of the house and that appellant then stuck his penis into her vagina. Jane Doe described another incident in which she went into the attic of the house to get some things. She said that appellant followed her into the attic. Jane Doe testified that appellant told her to pull down her pants and bend over and that appellant then stuck his penis into her vagina. Jane Doe described another incident that occurred in the front seat of a car that was at their house. She said that appellant

---

[2]We use the mother's initials to protect the identity of the child.

told her to lie down in the car and that appellant pulled off her pants and underwear. Jane Doe said that appellant unzipped his pants, took out his penis, and then stuck it into her vagina. Jane Doe also testified that, on one occasion, appellant stuck his penis into her bottom, which she referred to as a "heinie hole."

Jane Doe explained that, during incidents of sexual abuse, "[appellant's penis] was kind of soft at first, but then it always got hard." Jane Doe said that it hurt her when appellant put his penis into her vagina. She testified that appellant would "move up and down" when his penis was in her vagina and that it hurt more when he was moving up and down. She said that appellant put his penis "all the way" into her vagina. Jane Doe said that, on one occasion, she bled when appellant put his penis into her vagina. She also said that, when appellant "moved" his penis out of her vagina during one of the incidents in her bedroom, "white stuff" got all over her leg and the bed.

Jane Doe testified that the last time appellant stuck his penis into her vagina occurred on November 16, 2007. She believed that appellant left "white stuff" inside her on this occasion. Jane Doe testified that she did not tell anyone that appellant was sexually abusing her because appellant told her that he would kill her mom, her siblings, and her if she told.

During the weekend of November 16 and 17, 2007, Jane Doe stayed at her Aunt Nan's house. Jane Doe testified that she told Nan that appellant had touched her. Jane Doe said that she told Nan because she trusted Nan. Jane Doe said that she returned to her house on Monday, November 19, 2007. She testified that appellant left the house to go to Nan's house. She said that, when appellant returned home, he was cussing and said that she had started "bullshit." Jane Doe said that her mom, E.M.M., asked her what had happened and that, in response, she told her mom what appellant had done to her. Jane Doe also told her mom that she might still have "white stuff" inside her.

E.M.M. testified that, on November 19, 2007, she and appellant were at home. E.M.M. said that appellant left the house to go to Nan's house and that, when he returned home, he talked with Jane Doe alone in her room. When appellant left Jane Doe's room, E.M.M. asked appellant what was going on. Appellant told her that it was no big deal and that "[Jane Doe] was just starting shit." E.M.M. said that she questioned appellant further and that appellant told her that Jane Doe had told Nan he had messed with her "boob." E.M.M. testified that she then talked with Jane Doe and asked her what was going on. E.M.M. said that, after she talked with Jane

4

Doe, she was steamed and irate. She again confronted appellant. According to E.M.M., appellant admitted to "messing with" Jane Doe and said, "I did it." E.M.M. testified that appellant told her that "he had licked [Jane Doe's] boob and messed with her, but that he didn't pop her cherry." E.M.M. was furious and wanted to hurt appellant. E.M.M. said that she did not want to be alone with appellant because she did not know if she could control herself. Therefore, she called Larry Dean Chadwick Jr., who was appellant's cousin and best friend, and told him to come to the house. E.M.M. testified that she told Chadwick what Jane Doe had told her and what appellant had admitted he had done. Chadwick arrived at the house, and Nan also came to the house. E.M.M. called the police. She said that, when the police arrived, she, appellant, Chadwick, and Nan were standing in the carport. The next day, E.M.M. took Jane Doe to a doctor's office, where she was examined by a physician's assistant. Jane Doe gave a forensic interview the same day. Soon thereafter, E.M.M. and her children moved to Kansas to live with E.M.M.'s parents, and E.M.M. divorced appellant.

Nan testified that appellant is her nephew. She said that, on November 17, 2007, she was at her house with Jane Doe and that, on that date, Jane Doe told her that appellant had done something to her. Nan said that she told Chadwick about what Jane Doe had told her and that Chadwick then contacted appellant about Jane Doe's allegations. Nan said that appellant called her later and told her that "it didn't happen." On November 19, 2007, Nan went to appellant's house because she learned that the police were there.

Nan testified that she did not believe Jane Doe's allegations. She said that Jane Doe had problems and was a liar. Nan admitted that she did not tell the police that Jane Doe was a liar. Nan said that she gave a written statement to the police. She said that she did not put anything in the statement about Jane Doe being a liar because she did not think about it when she gave her statement.

Chadwick testified that, on November 19, 2007, Nan called him. He said that Nan was upset. Nan told him that Jane Doe had alleged that appellant had touched her and done things to her. Chadwick said that he called appellant and that appellant came over to his house. Chadwick said that he told appellant about Jane Doe's allegation that "[appellant] had been messing with her." Chadwick gave a written statement to the police. He acknowledged that, in his statement, he said he told appellant that Jane Doe had told Nan "she had white stuff all over her leg." Chadwick said that appellant was upset about the allegations and could not believe that

5

Jane Doe would say anything like the statement about "white stuff." Appellant told Chadwick that he was going to have a talk with Jane Doe.

Chadwick testified that, at about 9:00 p.m. that night, E.M.M. called him and said, "Oh, it's true. It's true." He said that E.M.M. was upset and mad. Chadwick said that he did not believe the allegations were true. Chadwick went to appellant's house. When Chadwick arrived, appellant was in a van. Chadwick testified that appellant got out of the van and said, "Go ahead and hit me. I know that's what you're here for." Chadwick told appellant that he was not going to hit him. According to Chadwick, appellant said, "Well, I guess that's what I deserve." Chadwick testified that he responded, "Well, I guess so, but I'm not going to be the one to do it." Chadwick said that he asked appellant what he was thinking and that appellant responded, "Obviously, I wasn't." Chadwick admitted that he told the police officers that he was in "complete shock" over what appellant told him. Appellant told Chadwick that he was going to leave. Chadwick then told appellant that he could not run away from his problems. Chadwick testified that he told appellant that appellant was going to go to jail. Chadwick stated in his written statement that appellant responded, "I'm not ready to go to jail." Chadwick told appellant that he should have thought about that before, and appellant responded that he should have thought about it before. Chadwick testified that the police arrived at appellant's house thirty to forty-five minutes after he got to the house.

Cisco Police Department Investigator Jason Weger testified that, on November 19, 2007, he received a call from dispatch advising that a woman had reported that her husband had admitted to sexually molesting their child. The address for the dispatch was appellant's residence. Cisco Police Officer Matthew Scurry arrived at the scene before Investigator Weger arrived. When Investigator Weger arrived, he talked with Officer Scurry. Investigator Weger also talked with E.M.M., Nan, and Chadwick. Investigator Weger said that E.M.M. was upset and angry, that Nan was upset and concerned, and that Chadwick was upset and in shock. Investigator Weger testified that there was no indication from anyone that Jane Doe was a liar or making up anything. Officer Scurry testified that he did not hear anyone say that Jane Doe was lying or had made up her allegations. Officer Scurry transported appellant to the police station.

At the police station, Officer Scurry took a written statement from Chadwick. Chadwick said in the statement that "[he] was in complete shock of what [appellant] just told [him]." Officer Scurry testified that Chadwick did not tell him that Jane Doe was lying about what

6

happened. The following day, Investigator Weger took a written statement from Nan. Investigator Weger testified that Nan did not express to him that Jane Doe was a liar or that she believed Jane Doe's allegations were not true. Investigator Weger testified that, based on his investigation, he concluded that appellant assaulted Jane Doe multiple times, that the first assault occurred on or about August 15, 2007, and that the assaults continued to occur until November 17, 2007.

Sharla Brook Carroll testified that she was employed as a physician's assistant at the Family Health Clinic. She testified that she examined Jane Doe on November 20, 2007. Carroll interviewed Jane Doe as part of the examination. Carroll testified that Jane Doe told her that appellant had molested her for "quite some time" before she was ready to come forward and tell someone about it; that appellant had told her not to tell anyone; that appellant had molested her or had intercourse with her over twenty times; that appellant had engaged in sexual intercourse with her; that appellant had "put his bad part inside of [her], and it hurt"; that "intercourse [had] happened every time that [appellant had] licked her genitals and licked her breasts"; that, "when [appellant had] pushed his bad part against her, the white stuff went all over"; and that appellant had engaged in anal intercourse with her on one occasion. Carroll said that Jane Doe knew things that "normal 12 and 13-year old little girls do not know."

During the examination, Carroll determined that Jane Doe did not have any bruising, lesions, or tears in her vaginal area. Carroll saw a small tear in Jane Doe's hymen. Carroll testified that the tear could have been caused by penetration by a penis. However, Carroll said that any sort of trauma can tear a hymen and that, therefore, there was no way to determine whether the tear in Jane Doe's hymen had been caused by a penis. The results of Carroll's examination of Jane Doe were inconclusive as to whether or not she had been sexually assaulted. Carroll testified that finding no evidence of sexual assault during an examination is not unusual. She said that the genital area is very vascular in nature and heals very quickly. She explained that, in most cases, signs of trauma in the genital area exist only for a day or two after a traumatic injury occurs. Carroll also testified that no semen was detected during her examination of Jane Doe. However, she also said that semen normally can be detected for only twenty-four to thirty-six hours and that, therefore, it is unlikely that semen would be detected in an examination that is performed four days after a sexual assault. Jane Doe claimed that the last sexual assault occurred on November 16, 2007, which was four days before she saw Carroll.

7

The defense called a number of witnesses to provide opinion testimony as to whether Jane Doe was truthful. Melissa Starr was Jane Doe's third grade reading teacher. Starr testified that Jane Doe was dishonest at times. Starr explained that Jane Doe was dishonest about things that typical third graders might be dishonest about. Starr said that Jane Doe would be dishonest when she was in trouble but, if confronted, would eventually tell the truth. Mindy Stephenson was Jane Doe's fifth grade homeroom teacher. Stephenson testified that Jane Doe lied quite a bit and more than most children. Stephenson said that, if confronted, Jane Doe would most of the time tell the truth. Donna Baker was Nan's neighbor. Baker testified that she knew Jane Doe. Baker said that Jane Doe would not tell the truth. Norma Chadwick, Chadwick's mother, testified that "[Jane Doe] will lie to you as fast as she'll look at you, and make you believe it." The defense also called Chadwick back to the stand. Chadwick did not believe "that the truth [was] in [Jane Doe]."

Appellant testified that Jane Doe's allegations were not true. He said that he had never sexually abused her. Appellant said that "[Jane Doe] would rather climb a tree and tell you a lie than stand on the ground and tell you the truth." He also said that Jane Doe "lied all the time" and that, "[i]f her mouth is open, she's probably lying." Appellant believed that Jane Doe made up her allegations against him as a way to get back at him for spanking her for pulling a gun on her brother and his friend.

Appellant testified that Chadwick called him and said that he needed to talk with him about something important. Appellant said that he went to Nan's house and talked with Chadwick. According to appellant, Chadwick told him that Jane Doe had alleged that "[appellant] had touched her boob." Appellant testified that he told Chadwick that he was going to talk with Jane Doe. Appellant said that he went home and talked with Jane Doe. He said that he asked her, "Why [was] she saying all this stuff?" Appellant said that Jane Doe would not answer him. Appellant then told E.M.M. that Jane Doe was "starting crap." Appellant said that he told E.M.M. about Jane Doe's allegations. Appellant said that, later, E.M.M. told him that Chadwick was "on his way over to kick [his] tail." When Chadwick arrived, appellant was sitting in his van. Appellant said that he asked Chadwick whether he was there "to kick [his] tail." Appellant testified that he did not tell Chadwick, "Well, that's what I deserve," but instead told him, "If I would have done that, that's what I would have deserved." Appellant acknowledged that, when Chadwick asked him what he was thinking, he responded that he was

not thinking.  Appellant testified that, when he made this statement, he was not admitting guilt as to Jane Doe's allegations but, instead, was referring to his decision to tell E.M.M. about Jane Doe's allegations.

*Analysis*

In his first issue, appellant asserts that his conviction rests upon the uncorroborated testimony of Jane Doe.  Appellant contends that Jane Doe's testimony that he sexually abused her was uncorroborated and lacked credibility and that, therefore, the evidence was insufficient to establish that sexual abuse occurred.  Appellant states in his brief that, "where, as here, not only is there a motive for lying clearly established, but at least five witnesses (most of them unrelated to the complainant or the accused) testify that the complainant's reputation for lying is bad, it remains that one may reasonably conclude that the evidence is so weak that the verdict is clearly wrong and manifestly unjust."

The testimony of a child victim alone is sufficient to support convictions for aggravated sexual assault of a child and indecency with a child.  TEX. CODE CRIM. PROC. ANN. art. 38.07 (West Supp. 2011); *Chapman v. State*, 349 S.W.3d 241, 245 (Tex. App.—Eastland 2011, pet. ref'd); *Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.—Texarkana 2006, pet. ref'd); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd).  Thus, Jane Doe's testimony that appellant sexually assaulted her on multiple occasions is sufficient to establish that appellant sexually abused her multiple times.  The jury, as the trier of fact, was the sole judge of the credibility of the witnesses and the weight to be given their testimony.  TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007), art. 38.04 (West 1979).  As the sole judge of the credibility of the witnesses, the jury was free to believe Jane Doe's testimony that appellant sexually abused her and to disbelieve appellant's testimony that he did not sexually abuse her.  *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Polk*, 337 S.W.3d at 289.  As demonstrated by its verdict, the jury believed Jane Doe.  Appellant essentially asks us to conclude that Jane Doe is not credible even though the jury found her credible.  An appellate court, however, may not reevaluate the weight and credibility of the record evidence and substitute its judgment for that of the jury.  *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Viewing all the evidence in the light most favorable to the verdict, we note that evidence in addition to Jane Doe's testimony supports the conclusion that sexual abuse occurred.  E.M.M. testified that appellant admitted to "messing with" Jane Doe.  Appellant told E.M.M. that "he

had licked [Jane Doe's] boob and messed with her, but that he didn't pop her cherry." Carroll testified that Jane Doe told her that appellant had molested her for "quite some time" and had engaged in sexual intercourse and anal intercourse with her. According to Chadwick, appellant said that he deserved to be hit and that he obviously was not thinking. During his testimony, appellant tried to explain his statements to Chadwick. However, the jury was entitled to believe Chadwick's testimony about those statements. If believed, Chadwick's testimony supports an inference that, by his statements, appellant was acknowledging guilt on Jane Doe's allegations. We conclude that the evidence is sufficient to establish that multiple incidents of sexual abuse occurred as alleged in the indictment. Appellant's first issue is overruled.

In his second issue, appellant contends that the evidence was insufficient to establish that, if sexual abuse occurred, it occurred over a period of thirty or more days as required by Section 21.02(b) of the Penal Code. Jane Doe testified that the first incident of sexual assault occurred a few days after she returned to Cisco in the middle of August 2007. As appellant asserts, Section 21.02 of the Penal Code became effective September 1, 2007, and it does not apply to an offense committed before that date. *See Martin v. State*, 335 S.W.3d 867, 873 (Tex. App.—Austin 2011, pet. ref'd). An offense is committed before the effective date of the statute if any element occurs before that date. *Id.* Thus, the State could not rely on any "act of sexual abuse" that occurred before September 1, 2007, to prove the offense of continuous sexual abuse of a young child. Rather, to obtain a conviction in this case, the State was required to prove that continuous sexual abuse occurred for a period of thirty or more days during the time period beginning on September 1, 2007, and ending on November 16, 2007.

Jane Doe testified that appellant sexually assaulted her on multiple occasions. She said that the first incident of sexual assault occurred in August 2007 and that the last incident of sexual assault occurred on November 16, 2007. Jane Doe did not testify as to a specific date that any of the other sexual assaults occurred. She said that the sexual assaults occurred in the laundry room, her bedroom, appellant's bedroom, the master bathroom, the attic, and a car. Jane Doe told Carroll that appellant had molested her for "quite some time" before she was ready to tell someone about the abuse. Jane Doe also told Carroll that appellant had molested her or had intercourse with her over twenty times. The evidence was sufficient to establish that appellant engaged in a prolonged pattern of sexual assault of Jane Doe. Based on the evidence that multiple sexual assaults occurred and that those assaults occurred for "quite some time," the jury

could have reasonably inferred that appellant committed more than one act of sexual abuse against Jane Doe during a period that was thirty or more days in duration and that ended on November 16, 2007. Therefore, we conclude that the evidence is sufficient to support appellant's conviction. Appellant's second issue is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE


March 1, 2012

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.